T.C. Memo. 1996-500


UNITED STATES TAX COURT


KONDAMODI S. RAO AND B. SATYAVENI RAO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 4468-94.                          Filed November 6, 1996.


<u>Sanford Amdur</u>, for petitioners.

<u>Robert W. Mopsick</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined deficiencies in and
additions to petitioners' Federal income tax as follows:

| | | Additions to Tax | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653 (a)(1) | Sec. 6653 (a)(1)(A) | Sec. 6653 (a)(1)(B) | Sec. 6653 (b)(1) | Sec. 6653 (b)(1)(A) | Sec. 6653 (b)(1)(B) | Sec. 6661 |
| 1986 | $65,075 | --- | $2,025 | * | --- | $18,434 | ** | $16,269 |
| 1987 | 33,648 | --- | 453 | * | --- | 18,448 | ** | 8,412 |
| 1988 | 24,644 | $412 | --- | --- | $12,296 | --- | --- | 6,161 |

* 50 percent of the interest due on the portion of the underpayment due to negligence.
** 50 percent of the interest due on the portion of the underpayment due to fraud.

All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

Petitioner Kondamodi S. Rao, hereinafter referred to as Dr. Rao or petitioner, omitted gross income from his sole proprietorship psychiatry practice in 1986, 1987, and 1988. Petitioners deducted losses on their joint Federal income tax returns in 1986, 1987, and 1988 from the operation of Forest Park Medical Center (the medical center). After concessions, the issues for decision are:

(1) Whether Dr. Rao[1] is liable for the additions to tax for fraud pursuant to section 6653(b)(1)(A) and (B) for 1986 and 1987 and section 6653(b)(1) for 1988;

(2) whether petitioners have substantiated deductions from the operation of the medical center for 1986, 1987, and 1988 in amounts greater than that allowed by respondent; and, if so,

(3) whether petitioners had amounts "at risk" under section 465 to enable them to deduct losses from the operation of Forest Park Medical Center; and, if so,

(4) whether the passive loss rules under section 469 either restrict or disallow petitioners' losses from the operation of the medical center;

---

[1] Respondent conceded the additions to tax for fraud for B. Satyaveni Rao (Mrs. Rao) at trial.

(5) whether petitioners are liable for additions to tax for negligence under section 6653(a)(1)(A) and (B) for 1986 and 1987 and section 6653(a)(1) for 1988; and

(6) whether petitioners are liable for additions to tax for substantial understatement of income tax under section 6661 for 1986, 1987, and 1988.

## FINDINGS OF FACT

Petitioners Kondamodi S. Rao and B. Satyaveni Rao are husband and wife. They resided in Mountain Lakes, New Jersey, at the time the petition in this case was filed. Petitioners timely filed joint Federal income tax returns for 1986, 1987, and 1988. Prior to the expiration of time prescribed by section 6501(a) for the assessment of income tax due for each of the years 1986, 1987, and 1988, petitioners and respondent executed written agreements pursuant to section 6501(c)(4) extending the period for the assessment of tax due for the years in issue. Respondent timely issued a statutory notice of deficiency whereby she determined that petitioners fraudulently failed to report Schedule C gross receipts in the amounts of $50,130, $63,890, and $49,681 for the years 1986, 1987, and 1988, respectively. Respondent further determined that petitioners were not entitled to deduct Schedule E rental losses from the operation of the medical center of $102,548, $25,000, and $25,000, for the years 1986, 1987, and 1988, respectively. Respondent further determined that petitioners were liable for the addition to tax

for negligence only with respect to the disallowed medical center losses and that petitioners were liable for the addition to tax for substantial understatement of income tax.

Dr. Rao

Dr. Rao was born on May 14, 1946, in India. He graduated from medical school in Kurnool, India, and finished his internship in 1970. Dr. Rao "was very established * * * making a lot of money" while he worked in India. Petitioners came to the United States in 1975. Dr. Rao completed 5 years of training in the field of child psychiatry at Brookdale Hospital.

Dr. Rao was married and had two children by 1980. He lived in Bayside (Queens), New York, and was a full-time employee of a hospital where he did his residency/fellowship training. From 1979 until the end of 1981, after finishing his residency/ fellowship training, Dr. Rao worked in at least two private clinics in Queens doing consultation work in the field of psychiatry.

Dr. Rao's Schedule C Income

During the years in issue, Dr. Rao worked as a psychiatrist at his private practice office located in Mountain Lakes, New Jersey, and as a member of the staff of Saint Clares-Riverside Medical Center in Denville, New Jersey. Petitioners maintained three bank accounts at Midlantic National Bank (Midlantic), a money market account and a checking account, both used in petitioner's psychiatric practice, and an account in the name of

Kondamudi Enterprises, Inc., used to make mortgage payments on the medical center. A fourth account at Chase Manhattan Bank (Chase) was used to pay an equipment loan from Chase during the years in issue.

On petitioners' income tax returns for the years 1986, 1987, and 1988, petitioners reported on Schedule C gross receipts from Dr. Rao's private practice of psychiatry in the amounts of $135,162, $170,569, and $212,522, respectively. In fact, Dr. Rao received gross receipts from his psychiatry practice during the years 1986, 1987, and 1988 in the amounts of $175,507, $220,408, and $259,637, respectively. Petitioners failed to report Schedule C gross receipts from Dr. Rao's psychiatry practice in the years 1986, 1987, and 1988 in the amounts of $40,345, $49,839, and $47,115, respectively.

## Dr. Rao's Record Keeping

Petitioner kept no books or records; he did not reconcile his checking accounts against bank statements or check bank deposits against his monthly bank statement. Petitioner did not deduct outstanding checks from his checking account to determine the amount of funds available in the checking account. Petitioner never received any instruction in bookkeeping or accounting in a school, nor had petitioner ever practiced with another professional.

Dr. Rao's Accountant

Petitioners authorized their accountant, Victor Raclaw, to act as their representative before the Internal Revenue Service (the IRS).  Dr. Rao was referred to Mr. Raclaw through a dentist, Dr. Sudhakar Shetty, who rented space from Dr. Rao at the medical center.  Mr. Raclaw started doing tax-related work for Dr. Rao in either 1982 or 1983.  Mr. Raclaw prepared Federal income tax returns on behalf of petitioners for the tax years 1986, 1987, and 1988.  Mr. Raclaw earned 120 credits towards a bachelor's degree from Brooklyn College and City College.  He does not have a college degree, nor is he a certified public accountant.

To prepare the tax returns, Dr. Rao provided Mr. Raclaw with Forms 1099, Forms W-2, bank statements, deposit slips, and canceled checks.  To determine Schedule C income, Mr. Raclaw asked Dr. Rao if he had received income from sources other than Form 1099 payers, and Dr. Rao responded that he received most of his income from insurance providers and Forms 1099.  Mr. Raclaw also asked Dr. Rao if he received cash from private patients.  Dr. Rao said most of his income was from insurance carriers, and "there was very little cash".  Some of the expenses on petitioners' Schedules E were averages, not specific expenditures.

Mr. Raclaw prepared a two-page schedule of the tax information for the tax year 1986 that was a summary of petitioners' Forms 1099, interest, money market, and Form W-2 income. This schedule was Mr. Raclaw's only workpaper for petitioners' 1986 tax year. The information contained in the two-page schedule was derived by Mr. Raclaw from petitioners' bank statements. In calculating the total amount of Schedule C income for petitioner, Mr. Raclaw totaled the Forms 1099 that were received by petitioner. Mr. Raclaw did not prepare a writeup, a cash receipts journal, or a cash disbursements journal. As part of his preparation of petitioners' tax returns, Mr. Raclaw performed an income versus deposit analysis together with an analysis of petitioners' Forms W-2, Forms 1099, and Schedule E income in an attempt to verify petitioners' total income for the years in issue. Mr. Raclaw made the determination to report income for all the years in issue based upon the Forms 1099 received from the insurance carriers. Dr. Rao did not examine his Federal income tax returns before signing them.

The IRS Audit

Revenue Agent Randall Gardner (agent Gardner) was assigned to work on the Rao audit in November of 1988. The audit encompassed the 3-year period from 1986 through 1988. As agent Gardner was an inexperienced agent, Roy Schwarmann (agent

Schwarmann), a revenue agent with 20 years of experience with the IRS, acted as his mentor during the course of the audit, providing guidance and assistance where and when needed.

Petitioner received an IRS audit notice in November 1988 from agent Gardner and turned the audit notice over to Mr. Raclaw to contact the IRS directly. All communications subsequent to the audit notice were exclusively between agents Gardner and Schwarmann and Mr. Raclaw, acting on behalf of petitioners. The initial appointment and many subsequent appointments were canceled by Mr. Raclaw. Agent Gardner prepared a case activity record indicating the activity on this case and the number of canceled appointments.

Mr. Raclaw indicated that he would get the requested information concerning petitioners' tax records to agent Gardner. Mr. Raclaw never furnished the documents to agent Gardner, who was forced to issue a summons to obtain the documents.

Agents Gardner and Schwarmann first met with Dr. Rao and Mr. Raclaw on August 30, 1989. Agent Gardner examined income and expense issues and also looked at bank statements. Petitioner, when asked to produce bank account information, showed agent Gardner information regarding two Midlantic Bank accounts, the money market account and checking account. Agent Gardner became aware that Dr. Rao received payments from sources other than

insurance companies; i.e., from individual patients, by analyzing items that were deposited into Dr. Rao's bank accounts. Dr. Rao denied to agents Gardner and Schwarmann that he had received payments from individual patients or from any source other than Form 1099 payers.

A second meeting was held on October 23, 1991,[2] at agent Gardner's office. Dr. Rao, Mr. Raclaw, and agents Gardner and Schwarmann were present. Mr. Raclaw was taken by surprise when agent Gardner stated to Dr. Rao that there were omissions of income. At this meeting, Mr. Raclaw learned, for the first time, that Dr. Rao had a bank account at Chase. However, this account only was used to pay an equipment loan made by Chase.

Forest Park Medical Center

Dr. Rao decided to set up a medical center which provided numerous medical services under one roof. On October 10, 1980, Dr. Rao entered into a contract for sale for the purchase of a two-story building (the building) located at 86-22 85th Street, Woodhaven (Queens), New York, from Al DiFranco, Inc. The building has 6,000 square feet with 3,000 square feet upstairs and 3,000 square feet downstairs. On December 18, 1980, by a bargain and sale deed, Al DiFranco, Inc., conveyed the property

---

[2] The 2-year time lag between meetings was not explained in the record.

to petitioners.  The purchase price of the building was $120,000, which included seller financing and the assumption of an existing mortgage.

Dr. Rao decided to borrow money for improvements to the building.  Upon application for a loan to Columbia Savings & Loan Association (Columbia), the bank told Dr. Rao that it would not make a loan to him on a personal basis, but rather would make a loan to a corporation.  Dr. Rao formed Kondamudi Enterprises, Inc. (Kondamudi).  Kondamudi was formed for the purpose of obtaining the loan from Columbia.  On September 11, 1981, Kondamudi obtained a building loan mortgage from Columbia in the amount of $120,000 at 18 percent interest per annum. Approximately $43,000 was to retire existing debt on the medical center, and the remaining $77,000 was designated for improvements.  Petitioners established a bank account in the name of Kondamudi at Midlantic National Bank to pay off the Columbia loan.  The loan payment was approximately $2,400 per month.  Mr. Raclaw prepared the corporate tax returns for Kondamudi.

On May 17, 1981, Dr. Rao entered into a contract with, and employed, general contractor Kostas Tsichlis (Tsichlis) to make improvements to the medical center.  Tsichlis furnished petitioner with a $70,000 estimate for improvements to the medical center.  Though improvements to the medical center were

made by Tsichlis and paid for by petitioner, their actual cost has not been established.  By 1982, the first floor of the medical center was complete, including dental equipment, ophthalmology equipment, and x-ray equipment.  The second floor facility was intended to be expanded by petitioner into a physical therapy center; however, it was not completed.  Most of petitioner's expenditures went to the remodeling and purchase of equipment located on the first floor.  No further renovations have been made at the medical center since 1983.

Petitioners maintained a Chase bank account in the name of the medical center for the purpose of paying a $50,000[3] equipment loan provided by Chase.  Dr. Rao transferred funds monthly from his Midlantic money market account into the Chase account in order to make the loan payments.

Dr. Rao entered into an agreement with Tilden Financial Corp. for the lease of dental equipment in the amount of $38,180.

Petitioner was the chief individual responsible for operating the medical center.  He paid for all expenses incurred in the operation of the medical center.  Such expenses included maintenance, x-ray supplies and film, gloves, and supplies for all doctors and a nurse.

---

[3]  The record does not establish what part of the loan was used to purchase equipment.

Physicians and a dentist working at the medical center paid rent to Dr. Rao either every time they came in for a session, or on a monthly basis. The medical center is still available for rental to physicians. Petitioner rented the upstairs portion to the Forest Park Senior Citizens Center since May of 1986.[4]

In order to calculate the medical center's expenses, as reported on Schedule E, Mr. Raclaw conferred with Dr. Rao to determine his monthly expenses for medical supplies, utilities, paper goods, other supplies, and payments to an assistant who worked there.

Petitioners reported the medical center's gross income and deductions and claimed the following losses on Schedules E for the years in issue:

|  | 1986 | 1987 | 1988 |
|---|---|---|---|
| Rents received | $45,000 | $46,800 | $104,550 |
| Expenses: |  |  |  |
| Advertising | 950 | --- | --- |
| Auto & travel | 600 | 240 | --- |
| Cleaning & maint. | 1,100 | 2,400 | 3,750 |
| Insurance | 2,628 | 2,782 | 3,175 |
| Mortgage interest | 59,719 | 16,182 | 58,196 |
| Repairs | 7,558 | 3,100 | 9,202 |
| Supplies | 3,600 | 2,000 | 2,186 |
| Taxes | 6,698 | 6,811 | 12,191 |
| Utilities | 5,951 | 6,000 | 5,510 |
| Telephone | 1,118 | 1,263 | 2,489 |
| Office expense | 2,370 | 4,185 | 2,680 |
| Salary | 12,000 | 12,000 | 12,000 |
| Water | 422 | 512 | 1,580 |

---

[4] This lease was entered into through Dr. Rao's corporation, Kondamudi.

| | | | |
|---|---|---|---|
| Other | 1,800 | --- | --- |
| Depreciation | 41,034 | 22,370 | 23,834 |
| Total expenses | $147,548 | $79,845 | $136,793 |
| Net Loss | ($102,548) | ($33,045) | ($32,243) |
| Loss claimed | ($102,548) | ($25,000) | ($25,000) |

For 1986 and 1987, the claimed losses relate solely to the medical center. For 1988, the claimed loss includes $10,105 of deductions for some undetermined rental activity. In her notice of deficiency, respondent allowed petitioners deductions equal to the gross income reported each year for the medical center.

OPINION

1. Preliminary Matters

Respondent on brief renews her objection to the admission into evidence of a 1995 video tape. The tape was authenticated at trial as representing the medical center's physical layout and equipment during the years in issue. We hold the tape is admissible.

Petitioner moved to dismiss the civil fraud addition to tax. Our decision makes that motion moot.

2. Civil Fraud Issue

A. Parties' Positions

Respondent argues that Dr. Rao committed fraud in his admitted failure to include all of his income from his psychiatry practice. Respondent points out that Dr. Rao is a highly educated businessman. Respondent argues that Dr. Rao reported income only as reported on Forms 1099; lied to IRS agents about

payments he received directly from patients; attempted to conceal the existence of two bank accounts; omitted substantial amounts of income over a 3-year period; and was uncooperative with IRS agents because his representative canceled many meetings. Respondent further argues that Dr. Rao cannot shift responsibility to his accountant since he did not provide him with all the information necessary to prepare accurate returns.

Petitioners argue that Dr. Rao has not committed fraud because the omissions from income were caused by his return preparer on whom Dr. Rao reasonably relied; no bank accounts into which income was deposited were concealed from the IRS agents; Dr. Rao has no accounting or financial expertise; Mr. Raclaw's cancellation of appointments cannot be considered lack of cooperation by Dr. Rao; and Dr. Rao provided his accountant with all the information necessary to compute gross income.

B.  The Law of Fraud

The addition to tax in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from a taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401 (1938).  Respondent has the burden of proving, by clear and convincing evidence, an underpayment for each year and that some part of the underpayment was due to fraud.  Sec. 7454(a); Rule 142(b); Katz v. Commissioner, 90 T.C. 1130, 1143 (1988); Otsuki v. Commissioner,

53 T.C. 96, 105 (1969). For 1986 and 1987, section 6653(b)(1)(A) provides for a 75-percent addition to tax on the portion of the underpayment which is attributable to fraud, and section 6653(b)(1)(B) provides for an addition equal to 50 percent of the interest payable on such portion. For 1988, section 6653(b)(1) provides for a 75-percent addition to tax on the portion of the underpayment that is attributable to fraud.

Fraud is intentional wrongdoing on the part of the taxpayer with the specific purpose to evade a tax believed to be owing. McGee v. Commissioner, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). The existence of fraud is a question of fact to be resolved from the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Respondent's burden is met if she shows that petitioner intended to evade taxes known to be owing by conduct intended to conceal income, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Respondent must meet this burden through affirmative evidence because fraud is never imputed or presumed. Toussaint v. Commissioner, 743 F.2d 309, 312 (5th Cir. 1984), affg. T.C. Memo. 1984-25; Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Petitioners' entire course of conduct can be indicative of fraud. Stone v. Commissioner, 56 T.C. 213, 224 (1971); Otsuki v. Commissioner, supra at 105-106.

C.  Underpayment of Tax

Petitioners have conceded an underreporting of Schedule C gross income of $40,345, $49,839, and $47,115 for the years 1986, 1987, and 1988, respectively.  This underreporting creates an underpayment of tax for all 3 years.  Consequently, the first part of the test for fraud is satisfied.

D.  Fraudulent Intent

Respondent must also prove that a portion of such underpayment was due to fraud.  Professional Servs. v. Commissioner, 79 T.C. 888, 930 (1982).

Because direct proof of a taxpayer's intent is rarely available, fraud may be proven by circumstantial evidence and reasonable inferences may be drawn from the relevant facts. Spies v. United States, 317 U.S. 492, 499 (1943); Stephenson v. Commissioner, 79 T.C. 995, 1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984).  An intent to conceal or mislead may be inferred from a pattern of conduct, Spies v. United States, supra at 499, or from a taxpayer's entire course of conduct, Stone v. Commissioner, 56 T.C. 213, 223-224 (1971).

Over the years, courts have developed a nonexclusive list of factors that demonstrate fraudulent intent.  These badges of fraud include:  (1) Understating income, (2) maintaining inadequate records, (3) failing to file tax returns, (4) implausible or inconsistent explanations of behavior, (5) concealment of income or assets, (6) failing to cooperate with

tax authorities, (7) engaging in illegal activities, (8) an intent to mislead which may be inferred from a pattern of conduct, (9) lack of credibility of the taxpayer's testimony, (10) filing false documents, and (11) dealing in cash. See Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). Although no single factor is necessarily sufficient to establish fraud, the combination of a number of factors constitutes persuasive evidence. Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603. We note that some conduct and evidence can be classified under more than one factor and not all badges are applicable in every case. The sophistication, education, and intelligence of the taxpayer are relevant to this determination. Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992).

a.   Petitioner's Sophistication and Experience

Dr. Rao is a medical doctor and also manages the medical center. He has no experience in accounting or tax return preparation. Based upon these facts, we shall not hold Dr. Rao to either a higher or lower standard while evaluating his actions.

b.   Consistent and Substantial Understatements of Income

The mere failure to report income is not sufficient to establish fraud. Merritt v. Commissioner, 301 F.2d 484, 487 (5th

Cir. 1962), affg. T.C. Memo. 1959-172; Parks v. Commissioner, 94 T.C. 654, 664 (1990). However, consistent and substantial understatement of income may be strong evidence of fraud. Marcus v. Commissioner, 70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). Moreover, a pattern of consistent underreporting of income, when accompanied by other circumstances indicating an intent to conceal income, justifies the inference of fraud. Holland v. United States, 348 U.S. 121, 137 (1954). Dr. Rao concedes that gross income of $40,345, $49,839, and $47,115 was omitted from his 1986, 1987, and 1988 Federal income tax returns, respectively. Therefore, he has consistently and substantially understated his income. However, Dr. Rao has made no attempt to conceal his income; all of his income was deposited into one of two bank accounts, and these bank records were given to his tax return preparer and the IRS agents.

### c. Failure To Maintain Adequate Books and Records

Failure to maintain adequate books and records of income is indicative of fraud. Truesdell v. Commissioner, 89 T.C. 1280, 1302 (1987); Gajewski v. Commissioner, 67 T.C. at 200. Petitioner kept no books or records. Dr. Rao attempts to blame his tax return preparer for failing to instruct him on bookkeeping requirements when, in fact, there is no evidence that he requested such instruction.

d. <u>Intent To Mislead</u>

Misleading statements to an investigating agent may be evidence of fraud. <u>Gajewski v. Commissioner</u>, <u>supra</u> at 200. Dr. Rao did mislead the IRS agents when he told them that he received no income directly from patients and that all of his income was from insurance companies or third party providers.

e. <u>Credibility of Dr. Rao's Testimony</u>

A taxpayer's lack of credibility, inconsistent testimony, or evasiveness are factors in considering the fraud issue. <u>Toussaint v. Commissioner</u>, 743 F.2d at 312. Dr. Rao's testimony was basically consistent and credible. Even if Dr. Rao's testimony is not credible in all respects, we may still be left with no more than a suspicion of fraud. See <u>Jenkins v. Commissioner</u>, T.C. Memo. 1995-563.

f. <u>Other Factors</u>

Dr. Rao provided his accountant, Mr. Raclaw, with all of the information necessary to compute gross income for his Schedule C business. A taxpayer's reliance upon his accountant to prepare accurate returns may indicate an absence of fraudulent intent. <u>Marinzulich v. Commissioner</u>, 31 T.C. 487, 490 (1958). However, the taxpayer must provide his accountant "with all of the data necessary for maintaining complete and accurate records". <u>Merritt v. Commissioner</u>, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172. Dr. Rao willingly provided Mr. Raclaw with

whatever information he requested. Mr. Raclaw was provided with Forms 1099, bank statements, and deposit slips from the two accounts into which Dr. Rao deposited income. There is no allegation of any income's not being deposited into the two bank accounts. Mr. Raclaw decided to calculate gross income by totaling the Forms 1099 rather than preparing a cash receipts journal. Though obviously in error--he missed substantial amounts of income--Mr. Raclaw believes he reconciled total deposits to total income. We find that Dr. Rao relied on Mr. Raclaw to prepare his tax returns accurately and that he supplied Mr. Raclaw with all the information necessary to properly compute gross income.

Respondent argues that Dr. Rao misled his accountant by telling him that he only received income from third-party payers, such as insurance companies. Respondent is mistaken. When asked by respondent's counsel "How did you go about determining the income on the Schedule C's that you filed with the tax returns", Mr. Raclaw answered:

> I went over the 1099, all the 1099s that he received, asked pertinent questions pertaining to other income, if he [Dr. Rao] received any income from any other sources, and the response was that he received most of his income from insurance -- insurance providers and the 1099s.

Mr. Raclaw did not testify that Dr. Rao told him that "all" or "almost all" of his income came from insurance and Form 1099

issuers; Mr. Raclaw used the word "most" to describe income from Form 1099 issuers, which is true. Dr. Rao may, or may not have, intentionally confused his accountant; the record is not clear, and clear and convincing proof is required to prove fraud.

We hold that respondent has not shown, by clear and convincing evidence, that Dr. Rao intended to omit gross income from his tax returns. We are bothered by Dr. Rao's attempt to mislead the IRS agents and lack of record keeping, but we shall not sustain respondent's determination of fraud when we are only left with a suspicion of fraud. Green v. Commissioner, 66 T.C. 538, 550 (1976); see Comparato v. Commissioner, T.C. Memo. 1993-52.

3. Substantiation of Schedule E Expenses

Respondent allowed petitioners Schedule E deductions equal to the gross rents reported in each of the years in issue, that is, $45,000, $46,800, and $104,550 for the years 1986, 1987, and 1988, respectively. Respondent disallowed deductions in excess of gross rents as being unsubstantiated. Petitioners' burden of proving that respondent's determinations in her deficiency notice are erroneous includes the burden of substantiation. See Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976). Deductions are a matter of legislative grace; petitioners have the burden of showing that they are entitled to any deduction claimed. New Colonial Ice Co.

v. Helvering, 292 U.S. 435, 440 (1934). Section 6001 requires taxpayers to maintain adequate records from which their tax liability may be determined. Petzoldt v. Commissioner, 92 T.C. 661, 686 (1989).

Petitioners offered no evidence or argument concerning the $10,105 of deductions taken for an undetermined rental activity. We hold that petitioners have abandoned that portion of the substantiation issue.

Petitioners have offered nothing other than vague testimony by Dr. Rao to substantiate expenses other than interest, equipment lease payments, and depreciation. We hold that these other expenses are not substantiated. "We know of no rule that uncontradicted testimony must be accepted by a court finding the facts, particularly where, as here, the testimony is given by interested parties." Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C. 593 (1964).

Petitioners proved that they bought the medical center building in 1980 for $120,000. Dr. Rao testified that in the early 1980's he borrowed $70,000 from Columbia to make improvements to the medical center and $50,000 from Chase to purchase equipment. However, no invoices or canceled checks were offered to substantiate any improvements or equipment purchases. We do not know exactly what equipment was purchased, how much the

equipment cost, or when it was placed in service.[5]  In order to support a deduction for depreciation, a taxpayer must establish a property's depreciable basis by showing the cost of property, its useful life or recovery period, and the previously allowable depreciation.  E.g., <u>Delsanter v. Commissioner</u>, 28 T.C. 845, 863 (1957), affd. in part, revd. in part, and remanded per curiam 267 F.2d 39 (6th Cir. 1959).  We hold that petitioners have not substantiated their depreciation deductions.

Petitioners leased $38,180 of equipment from Tilden Financial Corp.  Petitioners rely on a schedule of lease payments entered into evidence to show they paid $14,445 in 1986 and $11,170 in 1987.[6]  Petitioners rely on what appears to be a computerized schedule from Columbia to support interest deductions on Kondamudi's $120,000 loan.[7]  The schedule shows interest payments of $16,182 in 1987 and $18,614 in 1988.  No canceled checks or Forms 1098 were offered to substantiate petitioners' interest deductions.  These amounts, although questionable, are the only amounts substantiated by petitioners.

---

[5]  Pictures and a videotape in evidence show equipment exists at the time the pictures and videotape were taken, but they do not establish cost or when the equipment was placed into service.

[6]  Petitioners classified the lease payments as interest.

[7]  Due to petitioners' overall lack of substantiation, we need not address the issue of whether petitioners can deduct interest payments made on behalf of their corporation.

Respondent, by allowing petitioners to deduct amounts equal to the medical center's gross rents, had allowed deductions in excess of those substantiated by petitioners. Therefore, we hold that petitioners have not substantiated deductions in the aggregate in excess of that allowed by respondent.

The issues of limitation of loss under section 465 and section 469 passive loss limitations are thus rendered moot and need not be addressed.

4. <u>Substantial Understatement</u>

Section 6661 provides for a 25-percent addition to tax on any substantial understatement. <u>Pallottini v. Commissioner</u>, 90 T.C. 498 (1988). A substantial understatement is one that exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. Sec. 6661(b)(1). The amount of the understatement, for purposes of section 6661, is to be reduced by the portion attributable to any item for which there was substantial authority or any item that was adequately disclosed. Sec. 6661(b)(2)(B).

Petitioners have not argued that they had either substantial authority or adequate disclosure on their tax returns; rather, they argue that the Commissioner abused her discretion by not waiving the addition to tax. The Secretary may waive all or part of a section 6661 addition to tax upon a showing by the taxpayer that there was reasonable cause for the understatement and that

the taxpayer acted in good faith. Petitioners have the burden of persuading the Court that in refusing to waive this addition to tax, respondent has exercised this discretion "arbitrarily, capriciously, or without sound basis in fact." Mailman v. Commissioner, 91 T.C. 1079, 1084 (1988). In determining whether petitioners had reasonable cause and acted in good faith, the Court primarily looks to the extent of the taxpayers' efforts to assess their proper tax liability. Id. at 1084; sec. 1.6661-6(b), Income Tax Regs.

Petitioners attempt to blame their accountant for all their underreporting. The cause of petitioners' problems is an absence of record keeping and an unexplained failure to provide even the most basic documentary evidence, such as canceled checks, Forms 1098, invoices, and promissory notes. These shortcomings are not the fault of petitioners' accountant; he was not hired to perform these services. Dr. Rao testified that he did not even examine the tax returns before signing them; he cannot now claim that such action is reasonable and in good faith. We hold that the Commissioner did not abuse her discretion in not waiving the substantial understatement addition to tax under section 6661.

5. Negligence

For 1986 and 1987, section 6653(a)(1)(A) generally imposes an addition to tax equal to 5 percent of the entire underpayment if any part of it was due to negligence or disregard of rules or

regulations. Section 6653(a)(1)(B) imposes a further addition to tax in an amount equal to 50 percent of the interest payable with respect to the portion of the underpayment which is attributable to negligence or disregard of rules or regulations. For 1988, section 6653(a)(1) only provides for the 5-percent addition to tax. For purposes of section 6653(a)(1), the term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Code, and the term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6653(a)(3). Negligence also has been defined as a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. See Crocker v. Commissioner, 92 T.C. 899, 916 (1989); Neely v. Commissioner, 85 T.C. 934, 947-948 (1985). Failure by a taxpayer to keep adequate records may justify imposition of the addition to tax for negligence. See Lysek v. Commissioner, 583 F.2d 1088, 1094 (9th Cir. 1978), affg. T.C. Memo. 1975-293; Crocker v. Commissioner, supra at 917. Failure to maintain adequate records also indicates disregard of the rules or regulations that require a taxpayer to keep permanent records sufficient to establish, inter alia, the taxpayer's gross income and deductions. See Crocker v. Commissioner, supra at 917. Respondent only asserts the additions to tax for negligence to the extent that Schedule E expenses are disallowed. Petitioners failed to keep or maintain

adequate records, as described above.  They are liable for the additions to tax for negligence for all the years in issue.

To reflect the foregoing and concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.